UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:14-cv-00127-JHM

SABRINA AUSTIN-CONRAD                                        PLAINTIFF

V.

RELIANCE STANDARD LIFE                                      DEFENDANT
INSURANCE COMPANY

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Summary Judgment [DN 23] and Plaintiff's Motion for Leave to File a Reply Memorandum in Excess of Fifteen Pages [DN 25]. Fully briefed, these matters are ripe for decision.

## I. BACKGROUND

Plaintiff Sabrina Austin-Conrad was a registered nurse at the Trover Regional Medical Clinic beginning in 1991. (Admin. R. [DN 11-2] at 623.) In 2006, Plaintiff ceased working due to her disability, and Plaintiff sought long-term disability benefits beginning at this time. (Id. at 607.) Defendant, Reliance Insurance, determined that she was eligible for short-term disability benefits and later met the definition of "Totally Disabled" under her policy, and, as such, she was entitled to long-term disability benefits. (Id.) On January 8, 2013, upon Reliance's review of her claim file, Reliance determined that she was capable of working at the sedentary exertion level and therefore was no longer entitled to long-term disability benefits. (Id. at 587.) Reliance then terminated her long-term disability benefits. (Id.) Plaintiff filed an administrative appeal with Reliance, which Reliance denied on December 20, 2013. (Id. at 607–14.)

Plaintiff's medical history is extensive. In 1996, Plaintiff was diagnosed with Hodgkin's Lymphoma, for which she was treated with radiation and chemotherapy. (Id. at 680.) In August

of 2000, she had a recurrence of the disease in her abdomen, and she underwent a hybrid chemotherapy regimen and responded well to that treatment.  (Id.)  Despite her medical condition and her treatment, Plaintiff returned to work.  (Id.)  However, in 2006, Plaintiff injured herself at work while pulling a heavy cart and she felt a pop in her back.  (Id. at 665.)  She began to have pain in her thoracic area—the vertebrae in her spine and sought medical attention.  (Id.) She first saw Dr. Mesa, who took x-rays of her spine on the date of injury, and they revealed osteopenia in the mid-thoracic region.  (Id.)  Plaintiff later visited Dr. Lesley Shure, who determined that Plaintiff's posture and muscle tenderness indicated disuse atrophy, and she recommended that Plaintiff undergo chiropractic care for this injury.  (Id. at 667.)  As of September 27, 2006, Dr. Shure recommended that Plaintiff discontinue work until the cause of her pain was identified and managed, if possible.  (Id. at 669.)

Later that year, Plaintiff visited Dr. Wilhite, who also referred her to chiropractic care. (Id. at 677.)   On November 27 and 29, 2006 Plaintiff saw Dr. Eggers and Dr. Kluger respectfully, both of whom found that Plaintiff had no neurological issues, had normal motor skills, had no significant thoracic abnormality, and had no signs of cancer.  (Id. at 676–79.)  Both indicated that she did have back pain, however, it was rather "mild" according to Dr. Eggers, and Dr. Kluger stated that "[s]he [was] in no distress and look[ed] well."  (Id.)  Later, on December 11, 2006, Plaintiff visited Dr. Shah at the Merle M. Mahr Cancer Center, who reviewed Plaintiff's two MRIs, a PET scan, a CAT scan, a CT/PET scan, and her past medical history.  (Id. at 681).  Dr. Shah was unable to find "a true cause of the pain problem in the mid thoracic spine region," but did agree that this pain was unlikely related to a recurrence of her prior lymphoma. (Id. at 683.)  He determined that no treatment course should be pursued and observation would

be sufficient.  (Id.)  Based on her injury, Plaintiff was approved for short-term disability benefits through March 10, 2007.   (Id. at 688.)

On January 19, 2007, Dr. Wilhite again examined Plaintiff and determined that Plaintiff had limited capability to complete work-related tasks such as standing, sitting, walking, and driving, and could only do so for one to three hours per day.  (Id. at 692.)  She was also only capable of lifting less than ten pounds and only doing that occasionally.  (Id.)  Additionally, he noted that she was unable to perform simple grasping, pushing and pulling, or fine manipulation. (Id.)  Dr. Wilhite referred Plaintiff to Dr. Sims, a rheumatologist, who reviewed her medical history and treatment records.  (Id. at 730.)  Dr. Sims determined that Plaintiff suffered from chronic pain disorder/fibromyalgia, and recommended that she see Dr. Briones for physical medicine, rehabilitation, and future guidance regarding pain management.  (Id.)  Dr. Briones reviewed her medical chart and conducted a physical examination, which revealed eighteen trigger points for fibromyalgia in the thoracic and lumbar region, thighs, calves, upper arms, and elbows.  (Id. at 733.)  Dr. Briones recommended more physical therapy and deferred to her treating physician, Dr. Nadar, who had been treating her pain.  (Id.)

On June 7, 2007, Dr. Wilhite conducted a "Physical Capacities Questionnaire" in order to evaluate Plaintiff's clinical condition.  (Id. at 632.)  Upon examination, Dr. Wilhite found that Plaintiff was able to tolerate frequent sitting and occasional standing, walking, climbing stairs, using foot controls, and driving.  (Id.)  She was unable to lift above ten pounds and could only occasionally reach at waist or desk level.  (Id. at 632–33.)  Dr. Wilhite again stated that Plaintiff was suffering from fibromyalgia, chronic pain, and neuropathy from chemotherapy and radiation.  (Id. at 633.)

On February 24, 2008, Dr. Kluger found that despite her vertebral or paravertebral tenderness, Plaintiff had no neurological issues, that she was "doing reasonably well clinically," and, that she had no signs of recurring lymphoma.  (Id. at 793.)  He referred Plaintiff to Dr. Hotchman for a functional capacity evaluation for her disability plan at this time.  (Id.)  The results of the evaluation indicated that Plaintiff was able to perform at the "Sedentary Physical Demand Level according to the Dictionary of Occupational Titles, U.S. Department of Labor, 1991."  (Id. at 767.)  This evaluation reported that Plaintiff would need to take many micro-breaks to sit down, she would need to sit or lie down for five to ten minutes every one to two hours, and would likely miss more than four work days per month.  (Id. at 767–91.)  Additionally, Plaintiff was referred to Dr. Gray for a neuropsychological consultation on March 17, 2008.  (Id. at 852.)  Dr. Gray administered a comprehensive neurological battery and interviewed Plaintiff.  (Id.)  He found that Plaintiff's "neurobehavioral functions were well within normal limits except for the fact that she did process information inefficiently," but she did present some "neurovegetative signs and symptoms of depression as well as some fairly significant stress," and the neurocognitive difficulties she is experiencing appear to be directly related to her ongoing pain."  (Id.)  Overall, however, she did "have the ability to remember simple work rules and solve simple problems, at least from a neurocognitive perspective."  (Id.)  Plaintiff's benefits continued throughout this time.  (Id. at 761–62, 807–11.)

Dr. Sims later evaluated Plaintiff on April 14, 2008, finding that she met "all the classic symptomatic and physical exam criteria for fibromyalgia," but he also noted that there are "[n]o lab tests available specifically for this disease."  (Id. at 807.)  He further found that Plaintiff would likely have to miss about four work days per month, could occasionally lift less than ten pounds, and would need to take between five and ten minute breaks every one to two hours.  (Id.

at 809–11.)  Also in April of 2008, Plaintiff visited oncologist Dr. Prajapati who recommended Plaintiff continue treatment for her fibromyalgia and referred Plaintiff to Dr. Kim for an initial pain management consultation.  (Id. at 817, 856–57.)  Dr. Kim recommended several pain medications and noted that he had "[n]o psychological recommendations at [that] time." (Id. at 820.)

In the following years, between 2009 and 2012, Plaintiff saw Dr. Prajapati for her oncology needs, Dr. Kim for pain management, and Dr. Wilhite for other various medical needs. (Id. at 951–60, 979–81; Admin. R. [DN 11-3] at 1042–62.)  In November 2011, Plaintiff was also determined to be totally disabled by the Social Security Administration (hereinafter "SSA") as of January 7, 2010.  (Admin. R. [DN 11-2] at 1008.)  Plaintiff immediately notified Reliance of this determination on November 27, 2011.  (Id. at 1015.)  Reliance received back pay for its overpayments in prior months by check from Plaintiff with funds supplied by the SSA.  (Id. at 1024–29; Admin. R. [DN 11-3] at 1030–31.)

On March 9, 2012, Dr. Wilhite examined Plaintiff and filled out a "Physician's Report [regarding] Fibromyalgia."  (Admin. R. [DN 11-3] at 1061.)  He rated Plaintiff's functional status to be at 20%, meaning she had "[s]evere symptoms, even at rest," and she is "[r]arely able to leave home." (Id. at 1062.)  He stated that she could not successfully return to work, as she had "chronic pain/inability to lift/carry weight" and suffered from "fatigue." (Id.)  Further, Plaintiff was physically incapable of grocery shopping, exercise, or recreational activities.  (Id. at 1064.)

On June 18, 2012, Plaintiff initially consulted Dr. Johnson, a fibromyalgia pain specialist. (Id. at 1095.)  Dr. Johnson performed a complete range of motion examination, a lumbar spine exam, and a cervical spine exam, in which he found trigger points, tenderness, pain, and 14/18

positive fibromyalgia points.  (Id. at 1091–93.)  Dr. Johnson also reviewed her medical history and her medications list.  (Id. at 1094–95.)  On July 25, 2012, he ultimately found that Plaintiff could work at the "sedentary lift" exertion level—meaning she could exert up to ten pounds of force occasionally and/or a negligible amount of force frequently.  (Id. at 1105.)  Further, Plaintiff was capable of continuous fine manipulation, frequent simple grasping and reaching at waist/desk level, occasional reaching above mid chest level and pushing and pulling with both of her upper extremities.  (Id. at 1106.)  Dr. Johnson diagnosed Plaintiff with fibromyalgia, chronic pain syndrome, and chronic fatigue syndrome.  (Id.)

Upon receipt of Dr. Johnson's report, Reliance requested a survey of Plaintiff's social media activity.  (Id. at 1132–42.)  Between 2010 and 2012 Plaintiff posted about her many activities, including vacations, hours-long ghost-hunting and paranormal investigations around Kentucky, frequenting conventions and festivals, and attending concerts.  (Id.)

Because of this report, Reliance additionally requested that Plaintiff undergo an independent medical examination, which was performed by Dr. Samuels, a clinical psychologist. (Id. at 1163.)  He documented that Plaintiff did not experience any significant limitations to her overall functional abilities from a psychological perspective, though she experienced some difficulties with words and recalling newly learned information quickly and efficiently.  (Id. at 1166.)  He determined that she has no problems completing personal habits in an independent manner like dressing, cooking, and bathing, but she could not make complex meals due to pain. (Id.)  Because of her pain, she indicated she could not complete most household chores, but could do things like grocery shop in slow manner without any cognitive or emotional difficulties. (Id. at 1167.)  She also reported that she could not do many recreational activities that she used to, but she could garden between twenty to thirty minutes at a time, though she spent most of her

time reading.  (Id.)  Her face-to-face time with friends and family had decreased due to pain, but she maintained contact via social media and telephone calls.  (Id. at 1166–67.)  Dr. Samuels noted that Plaintiff's abstract reasoning, mood, attention, concentration, recent memory, remote memory, and speech all seemed to be within normal limits.  (Id. at 1167.)  Plaintiff appeared anxious due to the examination and her immediate memory seemed slightly impaired.  (Id.)  Overall, her examination indicated that she demonstrated at least adequate cognitive abilities in all categories.  (Id. at 1168.)  Dr. Samuels concluded that Plaintiff was "actually functioning at a higher level given significant decline and/or absence of symptoms of depression and other psychological stressors."  (Id.)  Further, he concluded that Plaintiff did "not appear to be psychologically impaired from functioning in a work environment as neuropsychological status is within normal limits and the presence of significant psychological symptoms are denied," and she had "the current psychological capacity to function in a consistent, evenly paced work environment."  (Id. at 1169–70.)

Reliance then conducted a "Residual Employability Analysis" on January 4, 2013 in order to determine if Plaintiff could work in any other occupation.  (Id. at 1174.)  The examiner found that Plaintiff lacked cognitive impairment, but did have sedentary restrictions and limitations.  (Id.)  Ultimately, the report indicated that Plaintiff could use her transferrable skills in several alternative occupations based on her physical restrictions, educational background, and employment history, including: utilization review coordinator, registrar for the nurses' registry, admitting officer, telemetry technician, telephone triage nurse, or rehabilitation nurse case manager.  (Id. at 1175.)  Due to this analysis, Plaintiff's medical history, the social media surveillance, Dr. Johnson's 2012 physical capacities examination, and Dr. Samuels' independent

medical examination, Reliance discontinued Plaintiff's disability benefits by letter dated January 8, 2013. (Admin. R. [DN 11-2] at 587–90.)

However, on June 19, 2013, Dr. Johnson sent a letter to Reliance stating that his initial 2012 report did not fully and accurately describe Plaintiff's condition. (Id. at 1218.) He stated that he was unable to indicate that Plaintiff would need to take frequent breaks due to her fibromyalgia, that the form did not allow him to list her other limitations in her activity levels. (Id.) He further posited that her medications help her pain, but do not act as a cure-all, as Plaintiff's pain and fatigue was severe enough to interfere with her attention and concentration needed to perform simple work tasks. (Id.) Ultimately, he found that Plaintiff's capabilities had not improved between 2012 and 2013, in accord with Dr. Wilhite's and Dr. Kim's analyses. (Id.)

Plaintiff appealed Reliance's decision to terminate her benefits on July 2, 2013. (Id. at 1207.) Reliance determined that another independent medical examination was necessary in order to properly process this appeal. (Id. at 1278.) Dr. Hazelwood was set to examine Plaintiff on September 26, 2013. (Id. at 1295) Dr. Hazelwood's report reveals a thorough analysis of Plaintiff's past medical history and treatment, her surgical history, her current medications, her allergies, her family history, and her social history. (Id. at 1317–1318.) He specifically noted that he was "given [an] almost 2 inch thick stack of records to review." (Id. at 1319.) He conducted a physical examination, finding that Plaintiff exhibited subjective indicators of pain and fatigue, but noted that "[f]ibromyalgia has no objective findings that can substantiate such a diagnosis." (Id. at 1323.) Dr. Hazelwood repeatedly stated in his report that there are no objective indicators or findings of fibromyalgia or chronic pain syndrome and he disagreed with the high levels of opioids prescribed to Plaintiff. (Id. at 1323–24.) Lastly, he concluded that

8

"there is no objective reason why this claimant cannot perform sedentary work," as no "restrictions are appropriate for a subjective diagnosis of fibromyalgia," and there is "no objective basis" to support her "need to miss work." (Id. at 1324.)

Reliance performed another Residual Employability Analysis on December 2, 2013. (Id. at 1343.)  The results did not change much, as the REA revealed that Plaintiff's viable occupational alternatives included: telemetry technician, registrar for the nurses' registry, and admitting officer.  (Id. at 1344.)

In considering the prior denial of benefits, Dr. Hazelwood's examination and conclusions, and the second REA, Reliance denied Plaintiff's appeal on December 20, 2013. (Admin. R. [DN 11-3] at 607.)  Both the initial denial letter and the letter regarding her appeal detail Plaintiff's medical history and the reasons for the denial of disability benefits.  (Id. at 607–614.)  Dissatisfied with Reliance's decision, Plaintiff brought suit in this Court requesting that the Court find that Reliance's denial of benefits was arbitrary and capricious and that the Court award Plaintiff benefits.  (Pl.'s Mem. Supp. Mot. Summ. J. [DN 23-1] at 2.)

## II. STANDARD OF REVIEW

Though Plaintiff brought this Motion under Rule 56, requesting that this Court grant summary judgment in her favor, "the summary judgment procedures set forth in Rule 56 are inapposite to ERISA actions and thus should not be utilized in their disposition." Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 619 (6th Cir. 1998).  Therefore, the Court will treat Plaintiff's Motion as one for judgment on the administrative record rather than one for summary judgment pursuant to the guidelines for the disposition of ERISA cases under Wilkins. Id.; see

Burklow v. Local 215 Int'l Bhd. of Teamsters, No. CIV. A. 4:02CV-32-M, 2008 WL 3243995, at *2 (W.D. Ky. Aug. 6, 2008).

"Although ERISA expressly provides for a private cause of action to recover benefits alleged to be due under a benefit plan, the statute is silent as to the standard of review which the Court is to apply in reaching a decision on the merits of such a claim." Calvert v. Firstar Fin., Inc., 266 F. Supp. 2d 578, 583 (W.D. Ky. 2003), rev'd on other grounds, 409 F.3d 286 (6th Cir. 2005); see Brainard v. Liberty Life Assurance Co. of Boston, No. CV 6:14-110-DCR, 2016 WL 1171542, at *3 (E.D. Ky. Mar. 24, 2016) ("ERISA itself does not specify a standard of review."). When "the plan provides the administrator with discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the Court should "review[ ] a denial of benefits under the highly deferential arbitrary and capricious standard of review." McAlister v. Liberty Life Assur. Co. of Boston, No. 15-5801, 2016 WL 2343030, at *4 (6th Cir. May 4, 2016) (quoting Smith v. Continental Cas. Co., 450 F.3d 253, 258–59 (6th Cir. 2006)); see Monica L. Crox v. UNUM Group Corp., No. 15-6006, 2016 WL 3924245, at *2 (6th Cir. July 21, 2016). The parties have stipulated that an arbitrary and capricious standard should be applied to Reliance's denial of long-term disability benefits.  (Rev. Joint Report [DN 9] at 2 ("[T]he Court is to make its decision under the abuse of discretion standard.").)

Under this standard, the administrator's decision should be upheld "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." McAlister, 2016 WL 2343030, at *5 (quoting Glenn v. MetLife, 461 F.3d 660, 666 (6th Cir. 2006), aff'd, 554 U.S. 105 (2008)).   Therefore, the Court "must evaluate the quality and quantity of the medical evidence and the opinions on both sides of the issues, and decide whether, in light of the administrative record as a whole, the explanation for the decision to deny or terminate

benefits is rational." Id. (quoting Cook v. Prudential Ins. Co. of Am., 494 Fed. App'x 599, 604 (6th Cir. 2012)).

Upon review of "the quantity and quality of the evidence," the Sixth Circuit has also stated "that 'substantial evidence' is 'more than a mere scintilla.' Id. (quoting McDonald v. Western–Southern Life Ins. Co., 347 F.3d 161, 171 (6th Cir. 2003)). Simply because "review must be deferential does not mean [the] review must also be inconsequential" or a "rubber stamp" of the plan administrators decisions. Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir. 2005) (citing Jones v. Metropolitan Life Ins. Co., 385 F.3d 654, 661 (6th Cir. 2004)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." McDonald, 347 F.3d at 171 (citation omitted). "The fact that the evidence might also support a contrary conclusion is not sufficient to render the plan administrator's determination arbitrary and capricious." Hurse v. Hartford Life & Accident Ins. Co., 77 Fed. App'x 310, 318 (6th Cir. 2003).

### III. DISCUSSION

Plaintiff cites many reasons as to why Reliance's decision to terminate her benefits was arbitrary and capricious. Plaintiff contends that Reliance's conflict of interest, Reliance's opposite position from the SSA, and Plaintiff's prior medical history weigh in her favor for finding Reliance's determination was not supported by substantial evidence. Reliance claims that the social media surveillance and the results of Reliance's screenings of Plaintiff's current medical condition (evidenced by the independent medical examinations and residual employability analyses) support its decision to discontinue Plaintiff's benefits.

### A. Conflict of Interest

Plaintiff claims that "because Reliance receives premiums and pays [Plaintiff] from its own assets," "Reliance's fiduciary role is in conflict with its interest in profit-making as a business." (Pl.'s Mem. Supp. Mot. Summ. J. [DN 23-1] at 40.)  When a plan like the one at issue authorizes the administrator "to decide whether an employee is eligible for benefits and to pay those benefits," an apparent conflict of interest exists.  Cooper v. Life Ins. Co. of N. Am., 486 F.3d 157, 165 (6th Cir. 2007) (internal citation omitted); see Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 112 (2008).  Courts must consider a conflict of interest as a factor when determining whether a plan administrator's decision was arbitrary or capricious.  See Calvert, Inc., 409 F.3d at 292–93.  However, a conflict of interest is just one factor considered in the Court's determination; it does not alone alter the applicable standard of review.  Smith v. Continental Cas. Co., 450 F.3d 253, 260 (6th Cir. 2006); see Schwalm v. Guardian Life Ins. Co. of Am., 626 F.3d 299, 311–12 (6th Cir. 2010); Shelby v. Lubrizol Corp. Wage Employees' Pension Plan, No. 5:09-CV-58, 2009 WL 4730203, at *3 (W.D. Ky. Dec. 4, 2009). The Court must simply weigh the conflict in the review process.  Smith, 450 F.3d at 260; Brainard v. Liberty Life Assurance Co. of Boston, No. CV 6: 14-110-DCR, 2016 WL 1171542, at *4 (E.D. Ky. Mar. 24, 2016). Therefore, the weight a conflict is due depends on the circumstances of each individual case, and its existence is not enough to change the review of the decision from deferential to *de novo*. Glenn, 554 U.S. at 106; Chinn v. AT&T Umbrella Ben. Plan No.1, No. CIV. 12-88-GFVT, 2013 WL 5468501, at *5 (E.D. Ky. Sept. 30, 2013).  In order to diminish the Court's deferential review under the arbitrary and capricious standard, the plaintiff must demonstrate that "a significant conflict was present," and the record must contain "significant evidence" that the plan administrator "was motivated by self-interest."  Smith, 450 F.3d at 260.

Other than simply pointing out that Reliance is both the administrator and payor of the plan at issue, Plaintiff fails to specifically identify significant evidence that would substantiate a claim that Reliance was motivated by self-interest in denying Plaintiff's continued long-term disability benefits.  Nothing in the record demonstrates a history of biased decision-making.  In fact, Reliance notes that it hired Dr. Hazelwood, who had only reviewed one other claim for Reliance, and Dr. Samuels, who had never performed any medical examinations for Reliance.  (Resp. [DN 24] at 11.)  While it is true that "when a plan administrator's explanation is based on the work of a doctor in its employ, [the court] must view the explanation with some skepticism," Moon v. Unum Provident Corp., 405 F.3d 373, 381–82 (6th Cir. 2005) (citing Univ. Hosp. of Cleveland v. Emerson Elec. Co., 202 F.3d 839, 846 (6th Cir. 2000)), Reliance in fact utilized neutral third party vendors in its claim and appeal process to set up the independent medical examinations.   (Admin. R. [DN 24] at 10.)  Additionally, this Court permitted Plaintiff to serve conflict discovery on Reliance, (Order [DN 15] at 11–14.), yet Plaintiff failed to provide the Court with evidence of bias or a conflict of interest.  Without more, Plaintiff has not met her burden to establish significant evidence of a conflict of interest that negates the court's differential review of Reliance's decision.   Therefore, the Court finds that no greater or lesser weight is given to the inherent conflict of interest in the Court's arbitrary and capricious analysis.  See Shelby, 2009 WL 4730203, at *3; see also Smith, 450 F.3d at 260; Perkins v. Prudential Ins. Co. of Am., No. CIV. A. 08-160-DLB, 2010 WL 299190, at *5 (E.D. Ky. Jan. 19, 2010).

**B.  SSA Decision**

Plaintiff additionally argues that Reliance failed to explain its contrary position to the SSA's decision that found Plaintiff totally disabled.  (Pl.'s Mem. Supp. Mot. Summ. J. [DN 23-1] at 28.)  Plaintiff insists that this point supports its conclusion that Reliance's denial of benefits

was arbitrary and capricious.  (Id.)  However, Plaintiff notes that "this is not reversible error by itself," but instead is a factor that the Court must weigh in determining whether an administrator abused its discretion.  (Id.)

Courts "have recognized that a disability determination by the Social Security Administration is relevant in an action to determine the arbitrariness of a decision to terminate benefits under an ERISA plan." Glenn v. MetLife, 461 F.3d 660, 667 (6th Cir. 2006), aff'd sub nom. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008).  When a plan administrator, like Reliance, benefits financially from the SSA's determination that a claimant was totally disabled, the plan administrator "obviously should have given appropriate weight to that determination." Id.   Therefore, "an ERISA plan administrator's failure to address the Social Security Administration's finding that the claimant was 'totally disabled' is yet another factor that can render the denial of further long-term disability benefits arbitrary and capricious." Id. (citing Calvert, 409 F.3d at 295).   Although the SSA's disability determination is "certainly not binding" and "does not, standing alone, require the conclusion that [Reliance's] denial of benefits was arbitrary and capricious," it "is far from meaningless." Calvert, 409 F.3d at 294–95 (citing Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003)).   It remains a significant factor to be considered upon review. Id. at 295.

Plaintiff argues that Reliance abused its discretion as a plan administrator because it failed to fully consider the SSA's decision.  (Pl.'s Mem. Supp. Mot. Summ. J. [DN 23-1] at 28.) Specifically, Plaintiff posits that Reliance should have compared and contrasted the definitions of "totally disabled" and the medical evidence both the SSA and Reliance relied upon in making their determinations.  (Id.)  Plaintiff insists that this failure to consider the SSA decision evidences Reliance's overall failure to consider relevant evidence in discontinuing Plaintiff's

benefits.  (Id.)  Further, Plaintiff argues that Reliance did not and cannot articulate a "legitimate reason why [the SSA] should not [have been] considered" in Reliance's decision to terminate Plaintiff's benefits.  (Id. at 29.)  Reliance indicates, however, that Plaintiff was awarded benefits by the SSA in a letter dated November 10, 2011.  (Resp. [DN 24] at 28.)  At that time, Reliance agreed with the SSA that Plaintiff was totally disabled, as Reliance was still paying for Plaintiff's disability benefits, and it was not until June 25, 2012 that Plaintiff's doctor, Dr. Johnson, first indicated that Plaintiff could likely work at a sedentary level and Reliance began to doubt Plaintiff's disability.  (Id.)  Plaintiff's benefits were not terminated until January 8, 2013, over one year after the SSA's determination that Plaintiff was totally disabled.  (Id.)  Reliance insists that at the time it discontinued Plaintiff's benefits, the SSA's decision was based on outdated information and did not consider the results of the IMEs or the REAs; therefore, the dissidence between the SSA decision and Reliance's discontinuance was logical and justifiable as of January 8, 2013.  (Id. at 28–29.)

Although the Sixth Circuit does not mandate that administrators provide an elaborate analysis when they decide to contradict an SSA benefits decision, it does require a "discussion about why the administrator reached a different conclusion from the SSA." Phillips v. Life Ins. Co. of N. Am., No. 1:10-CV-00064-R, 2011 WL 4435670, at *10 (W.D. Ky. Sept. 22, 2011) (quoting Bennett v. Kemper Nat. Servs., Inc., 514 F.3d 547, 554 (6th Cir. 2008)); see Glenn, 461 F.3d at 669.  In the letter terminating Plaintiff's benefits, Reliance explained why its decision contradicted that of the SSA.  (Admin R. [DN 11-2] at 589.)  Reliance reasoned that the SSA "did not have the results of our Independent Medical Examination and Residual Employment Analysis that was performed," and "[h]ad [the] SSA reviewed this report along with the other medical information obtained by us, they may have reached a different conclusion."  (Id.)

15

Reliance's discussion of the reason why it terminated benefits does not demonstrate that it did not undergo reasoned and principled decision making.  While rather short, Reliance's discussion compared its reasoning to that of the SSA and did not simply include "perfunctory language on the different policies and procedures of the SSA."  Phillips, 2011 WL 4435670, at *10 (finding the statement "the award letter from Social Security does not prove the existence of a medical condition that would preclude you from performing your or any occupation" in the insurance company's decision to be an inadequate discussion); see Rist v. Hartford Life and Acc. Ins. Co., No. 1:05–CV–492, 2011 WL 2489898, at *29–30 (S.D. Ohio Apr. 18, 2011) ("Hartford's statement that it uses a 'different definition of disability' hardly qualifies as any meaningful discussion of the SSA's decision.").

Additionally, Reliance's argument that the SSA decision was based on different facts and incomplete information is persuasive.  When an SSA decision is based on outdated medical records or information, courts have routinely held that it is not in error for the plan administrator to take a contradictory position to the SSA determination.  Nugent v. Aetna Life Ins. Co., 540 F. App'x 473, 476 (5th Cir. 2014), cert. denied, 134 S. Ct. 2147 (2014); Williams v. Metro. Life Ins. Co., 459 F. App'x 719, 729 (10th Cir. 2012); Halley v. Aetna Life Ins. Co., 141 F. Supp. 3d 855, 869 (N.D. Ill. 2015).  When the SSA reaches a decision based on outdated medical records and information that had not been updated prior to the plan administrator making a decision regarding benefits, the administrator is permitted to discount the SSA decision.  See Halley, 141 F. Supp. 3d at 869.  Here, the SSA made its determination based on all of Plaintiff's medical records prior to November 2011.  Only in June 2012 did Reliance begin to inquire into Plaintiff's functional capabilities based on Dr. Johnson's report.  Reliance then conducted two IMEs and two REAs, both of which were not considered in the SSA decision.  Based on these four reports,

Reliance denied Plaintiff continued benefits and upheld that decision again upon appeal. Relying on the SSA report would require Reliance to rely on incomplete information that did not reflect the investigative measures Reliance took in order to fully and accurately support its decision. Therefore, Reliance's evaluation and consideration of the SSA opinion was not in error and not evidence of an arbitrary or capricious decision.

### C. Medical Evidence

As seen, Plaintiff has a storied medical history with regard to the injuries and maladies at issue here, stretching as far back as 2006. Plaintiff argues that her benefits were discontinued in an arbitrary and capricious manner because she was initially awarded benefits finding that she was totally disabled, she has overwhelming evidence of a disability spanning a number of years, and Reliance's dependence on the independent medical exams and the residual employability analyses was unreasonable. Reliance maintains that Plaintiff's condition has changed over the past several years and she is no longer considered "disabled" for the purposes of the plan based on the results of the investigation beginning in 2012.

First, Plaintiff posits that "[i]t is unreasonable to find that a claimant ceases to be disabled absent a change in the underlying medical condition." (Pl.'s Mem. Supp. Mot. Summ. J. [DN 23-1] at 24.) As applied here, she argues that Reliance is bound by the initial award of benefits, as her condition has neither changed nor improved since her initial injury. See generally Kramer v. Paul Revere Life Ins. Co., 571 F.3d 499 (6th Cir. 2009) (holding that the plan administrator's cancellation of benefits was arbitrary and capricious when done in the absence of evidence showing that the claimant's condition had improved, and no explanation existed for the apparent discrepancy from earlier assessments); Walke v. Grp. Long Term Disability Ins., 256 F.3d 835 (8th Cir. 2001) (overturning administrator's termination of benefits where nothing in record

demonstrated medical improvement or change in circumstances to warrant termination of benefits); Norris v. Citibank, N.A. Disability Plan (501), 308 F.3d 880 (8th Cir. 2002) (finding insurer abused its discretion when it failed to reconcile its initial conclusion that the insured was unable to perform sedentary work with its conclusion five months later that she could perform sedentary work).   However, Reliance highlights the fact that "an initial benefit award does not guarantee payment of future benefit claims."   (Resp. [DN 24] at 13.)   See e.g. Hensley v. Int'l Bus. Machs. Corp., 123 Fed. App'x. 534, 538 (4th Cir. 2004); Ellis v. Liberty Life Assur. Co. of Boston, 394 F.3d 262, 273–274 (5th Cir. 2004).   In her Reply, Plaintiff agrees that Reliance is neither forever bound by the initial award nor that Reliance must prove a change in her condition, but that the new evidence of Plaintiff's condition is not sufficient to terminate her benefits and is not conclusive of her diminished disability.   Plaintiff is correct in that generally, "[t]here is no requirement that the claim administrator must demonstrate a change or improvement in the claimant's condition before terminating benefits previously awarded." Nicolai v. Aetna Life Ins. Co., No. 08-CV-14626, 2010 WL 2231892, at *6 (E.D. Mich. June 3, 2010).   "All that ERISA requires is that substantial evidence support a plan fiduciary's benefits decision—whether it be to deny benefits initially or to terminate benefits previously granted—when, as here, the plan fiduciary is vested with the discretion to determine, *inter alia*, both initial and continued eligibility for benefits."   Id. (quoting Ellis v. Liberty Life Assur. Co. of Boston, 394 F.3d 262, 274 (5th Cir. 2005)).   Therefore, this Court is solely charged with determining whether Reliance's decision was "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence."   Glenn, 461 F.3d at 666 (quoting Baker v. United Mine Workers of Am. Health & Ret. Funds, 929 F.2d 1140, 1144 (6th Cir. 1991)).

Plaintiff insists that the plethora of medical records spanning a number of years unquestionably demonstrates that her condition neither changed nor improved between 2006 and 2013 to justify a denial of benefits.  To her credit, Plaintiff has supplied extensive evidence of her alleged disability.  Despite her medical record, Plaintiff now claims that Reliance denied her benefits in an arbitrary and capricious manner, as the denial was based on social media surveillance that was not demonstrative of her functional capabilities, unreasonable reliance on the independent medical examinations, and undue consideration of faulty residual employability analysis.[1]  First, [p]laintiff claims that the social media surveillance was improper.  However, generally, "there is nothing inherently improper about a claims administrator conducting surveillance to document a Plaintiff's functional capabilities." Sears v. Drees Co., No. CIV.A. 13-132-DLB, 2015 WL 779003, at *11 (E.D. Ky. Feb. 24, 2015) (citing O'Bryan v. Consol Energy, Inc., 477 F. App'x 306 (6th Cir. 2012).  Here, Reliance conducted social media surveillance of Plaintiff that revealed that Plaintiff had been performing many activities that contradicted her reported level of physical capabilities.  For example, on December 15, 2012, Plaintiff wrote on her Facebook page that there were several Christmas presents on her living room floor waiting to be wrapped by her, that she needed to write Christmas cards, and she needed to make cookies.  (Admin. R. [DN 11-3] at 1134–35.)  Additionally, Plaintiff traveled to West Palm Beach for a week-long vacation between January and February of 2011, she indicated that she was attending a paranormal investigation at the Perryville Battlefield in May 2011, she vacationed in Florida again in September of 2011, she attended a Booth Brothers concert in April 2012 in Florida, attended a John Mellencamp concert in May of 2012, went on a paranormal expedition in Alton, Illinois on June 1, 2012, went on an eight hour paranormal expedition to

---

[1] Though Plaintiff argues that her pharmacy records should have been considered in the determination of whether or not Reliance would continue her benefits, both parties agree that the medications that Plaintiff was and continues to take do not render her disabled under the terms of her plan.  (Resp. [DN 24] at 27; Reply [DN 26] at 16.)

Waverly Hills Sanatorium in Louisville, Kentucky on June 10, 2012, went on a paranormal expedition to McLean County, Kentucky on July 24, 2012, and went dancing at an Orb Concert on August 1, 2012.  (Id. at 1135–38.)  Further, Plaintiff is an active member of the McLean County Paranormal Studies organization (hereinafter "MCPS"), which holds several paranormal investigations a month and regularly attends conferences and conventions as a group.  (Id.  at 1138–41.)  Reliance argues that these social media posts illustrate the fact that Plaintiff is capable of engaging in more activity than she or her treating physicians admit.   (Response [DN 24] at 15–22.)  Plaintiff contends that "[n]one of the social media posts that Reliance used are full descriptions of [her] activities," and they are "almost are taken out of context."  (Reply [DN 26] at 12.)  Even though she claims to be disabled, Plaintiff maintains that she can still "wrap[] a few holiday presents or . . . engage in socially expected activities."  (Id. at 13.)

However, Plaintiff carries the burden of presenting evidence showing that she was disabled from performing any occupation for which she was reasonably qualified by education, training, or experience.  See Tracy v. Pharmacia & Upjohn Absence Payment Plan, 195 Fed. App'x 511, 516 n. 4 (6th Cir. 2006) (noting that the plaintiff bears the burden of proof in an ERISA benefits case).  While the social media surveillance may not, by itself, prove that Plaintiff is capable of working forty hours a week, it does refute several of Plaintiff's claimed limitations.  See Rose v. Hartford Fin. Servs. Grp., Inc., 268 F. App'x 444, 452 (6th Cir. 2008); Lingo v. Hartford Life & Acc. Ins. Co., No. 1:09-CV-867, 2011 WL 3608030, at *7 (S.D. Ohio Aug. 16, 2011).  For example, Dr. Wilhite reported that her functionality was at 20% in March of 2012, meaning she had "[s]evere symptoms, even at rest," and she was "[r]arely able to leave home." (Admin. R. [DN 11-3] at 1062.)  Further, he found that she was physically incapable of grocery shopping, exercise, or recreational activities.  (Id. at 1064.)  The posts on Plaintiff's Facebook

page illustrate that she was capable of performing many tasks like wrapping Christmas presents, going on vacation, and attending several paranormal investigations and explorations per year.

Reliance "was not required to 'ignore the inconsistencies between [Plaintiff's] assessment of her level of activity and the [social media record] of her activities.'" Rose, 268 F. App'x at 452. Reliance initially conducted the social media surveillance because in June of 2012, Dr. Johnson, Plaintiff's treating physician, found that plaintiff could work at a "sedentary-lift" level. (Admin. R. [DN 11-3] at 1105.) Upon receipt of the surveillance report, Reliance scheduled the first independent medical examination and residual employability analysis. (Id. at 1163, 1174.) However, both the original denial of Plaintiff's benefits and the denial of Plaintiff's appeal were based on medical evidence: Plaintiff's medical history and the results of the independent medical examinations and the residual employability analyses. (Id. at 587–90, 607–14.) The results of the social media investigation were neither included in Reliance's explanation of her denial of benefits nor is there any evidence in the record that they were given undue weight. The social media report merely alerted Reliance to Plaintiff's potential ability to work. Accordingly, no arbitrary or capricious finding can be based on Reliance's use of social media surveillance alone because multiple factors were indeed considered and accorded much more weight than this surveillance. See O'Bryan v. Consol Energy, Inc., 477 F. App'x 306, 309 (6th Cir. 2012) (finding that though surveillance was considered, the plan administrator's decision was not arbitrary and capricious because it was based on medical findings); Rose, 268 F. App'x at 452–53 (same).

Plaintiff next argues that reliance on the independent medical examinations was unreasonable. Plaintiff asserts that "physicians repeatedly retained by benefits plans may have an incentive to make a finding of not disabled in order to save their employers money and to

preserve their own consulting arrangements." Nord, 538 U.S. at 832 (citation omitted).  The Sixth Circuit has "observed that a plan administrator, in choosing the independent experts who are paid to assess a claim, is operating under a conflict of interest that provides it with a 'clear incentive to contract with individuals who were inclined to find in its favor that [a claimant] was not entitled to continued [disability] benefits.'" Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston, 419 F.3d 501, 507–08 (6th Cir. 2005) (quoting Calvert, 409 F.3d at 292 (noting that the "possible conflict of interest inherent in this situation should be taken into account as a factor in determining whether [a plan administrator's] decision was arbitrary and capricious")).  Thus, although "routine deference to the opinion of a claimant's treating physician" is not required, the Court may consider whether "a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled'" as a factor in determining whether the plan administrator acted arbitrarily and capriciously in deciding to credit the opinion of its paid, consulting physician.  Id. at 508 (quoting Nord, 538 U.S. at 832).  In order to prove improper bias, "Sixth Circuit [case law] requires a plaintiff not only to show the purported existence of a conflict of interest, but also to provide 'significant evidence' that the conflict actually affected or motivated the decision at issue." Hunt v. Metro. Life Ins. Co., 587 F. App'x 860, 862 (6th Cir. 2014) (quoting Cooper, 486 F.3d at 165); see Peruzzi v. Summa Med. Plan, 137 F.3d 431, 433 (6th Cir. 1998)).

With regard to the independent medical examiners here, Plaintiff has offered only conclusory allegations of bias with regard to Dr. Samuels and Dr. Hazelwood.  She failed to present any empirical or statistical evidence to suggest that, when retained by Reliance, these doctors have consistently opined that claimants are not disabled.  See Kalish, 419 F.3d at 508 (citing Nord, 538 U.S. at 832 (stating that a determination of bias "might be aided by empirical investigation"); Calvert, 409 F.3d at 293 n. 2 ("The Court would have a better feel for the weight

to accord this conflict of interest if [the claimant] had explored the issue through discovery. While . . . discovery is . . . [ordinarily not] permissible in an ERISA action premised on a review of the administrative record, an exception to that rule exists where a plaintiff seeks to pursue a decision-maker's bias.")).   In fact, Reliance has shown that Dr. Samuels has never once been retained by Reliance and Dr. Hazelwood has only reviewed one other claim.  (Resp. [DN 24] at 11.)  In the absence of evidence of bias, the Court cannot conclude on this basis that Reliance acted arbitrarily and capriciously in deciding to credit the opinion of Dr. Samuels and Dr. Hazelwood over that of Dr. Wilhite and Dr. Johnson.  Kalish, 419 F.3d at 508 (citing Nord, 538 U.S. at 832.

Next, Plaintiff contends that Reliance improperly weighed the independent medical examinations over the opinions of Plaintiff's treating physicians without proper explanation and in spite of Plaintiff's medical record.  Plaintiff's overarching complaint is that both Dr. Samuels and Dr. Hazelwood "cherry picked" Plaintiff's medical history evidence in order to find in favor of Reliance.  Plaintiff believes Dr. Samuels "qualified several of his statements with 'at this time[,]' as she did not have any symptoms or stressors.  Second[,] Samuels did not say she had no mental limitations for a complete return to work; Samuels indicated that she needed evenly paced, consistent, and simple tasks. . . .  However, Samuels indicate[d] that she has no limits with 'performing effectively under stress[.]'"  (Reply [DN 26] at 15.)  Plaintiff asserts that Dr. "Hazlewood failed to fully explain his disregard of [Plaintiff's] treating physicians' opinions," and "misrepresented [Plaintiff's] activities of daily living in his report" because he found that Plaintiff "reported being able to perform activities like bathing and dressing by herself, but explained that she did not shop for groceries, cook, or clean by herself—chores that clearly constitute 'activities of daily living.'"  (Pl.'s Mem. Supp. Mot. Summ. J. [DN 23-1] at 37–38.)

In response, Reliance argues that it is not required to give special deference to Plaintiff's treating physician over these independent medical examiners.

Though Reliance has not embraced the disability conclusions of Plaintiff's treating physicians, it has not arbitrarily and capriciously disregarded them and cherry picked evidence against Plaintiff.  Reliance chose not to credit Plaintiff's treating physicians because Reliance believed that their conclusions were not supported by medical evidence.  Specifically, "[i]n the context of an ERISA disability plan . . . neither courts nor plan administrators must give special deference to the opinions of treating physicians."  Boone v. Liberty Life Assur. Co. of Boston, 161 F. App'x 469, 473–74 (6th Cir. 2005) (citing Nord, 538 U.S. at 834 ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.")).  Plaintiff's treating physician, Dr. Johnson, evaluated Plaintiff for the first time on June 18, 2012 and reviewed her extensive medical history and pharmacy records.  (Admin. R. [DN 11-4] at 1094–95.)  His initial assessment concluded that she indeed was capable of working at a sedentary level.  (Id. at 1105.)  Dr. Johnson conducted a thorough analysis, measuring many of Plaintiff's capabilities.[2]  (Id.)  Though Dr. Johnson only examined Plaintiff once, he was able to observe with a reasonable degree of certainty that she was capable of performing work at the sedentary level, as his report reflects.  Plaintiff complains that Dr. Samuels and Dr. Hazelwood were unable to take full stock of Plaintiff's condition from one visit

---

[2] Plaintiff submitted a letter in 2013 from Dr. Johnson noting that his initial report from 2012 did not fully and accurately reflect Plaintiff's condition.  (Admin. R. [DN 11-4] at 1218.)  Instead, he stated that her condition prevented her from performing simple work tasks and she could not work at the sedentary level.  (Id.)  Plaintiff credits Dr. Johnson's opinion and states that it accurately reflects her functional capabilities rather than the independent medical examiners' opinions.  Though this may be Plaintiff's perception of Dr. Johnson's report, Reliance's refusal to accept this recanting of his prior opinion was not arbitrary and capricious, as both the Supreme Court and the Sixth Circuit have noted that "a treating physician, in a close case, may favor a finding of 'disabled.'" Nord, 538 U.S. at 832; Kalish, 419 F.3d at 508.

and that they were unable to render an adequate analysis of her capabilities.  However, both Dr. Samuels and Dr. Hazelwood arrived at the same conclusions as Dr. Johnson upon initial review—that Plaintiff *could* work at the sedentary level.  These conclusions do not appear to be inaccurate, arbitrary, capricious, or based on "cherry-picked" evidence.  Additionally, both Dr. Samuels' and Dr. Hazelwood's reports reflect that they took great care to review Plaintiff's abundant medical history as reflected in the detailed summary included in their examination records.  Dr. Hazelwood even stated that he was "given [an] almost 2 inch thick stack of records to review."  (Id. at 1319.)  Even more, Dr. Samuels examined Plaintiff in 2013, five years following her initial psychological examination by Dr. Gray, and he found that she could function at a "higher level given significant decline and/or absence of presence of symptoms of depression and other psychological stressors."  (Id. at 1168.)  This not only demonstrates that Dr. Samuels had examined her medical history, but that he was familiar enough with it to compare her current condition to her state of being during her last psychological examination.  Rather than disregarding the past, Dr. Samuels actively contemplated her differing levels of functionality and made a reasoned judgment.  Similarly, Dr. Hazelwood discussed her current and past condition and in much detail described his prognosis and his suggested course of treatment.  (Id. at 1317–25.)   The Court cannot conclude that Reliance's crediting of these detailed and thorough examinations was arbitrary and capricious, particularly when they perfectly align with Plaintiff's treating physician's analysis done only one year prior.

Additionally, Plaintiff argues that Reliance denied her benefits arbitrarily and capriciously because Reliance required objective evidence of her condition when her plan did not require such evidence and because Reliance claims there is no objective evidence of disability in the record when Plaintiff believes she has asserted an abundance of such evidence.  The plan at

issue provides that a beneficiary will receive disability benefits once the beneficiary is disabled

as defined by the plan, after the completion of an elimination period.   The plan defines

"disabled" as follows:

> "Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness:
>> (1) during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;
>>> (a) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis.
>>> An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period;
>>> (b) "Residual Disability" means being Partially Disabled during the Elimination Period.   Residual Disability will be considered Total Disability; and
>> (2) after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of any occupation.  Any occupation is one that the Insured's education, training or experience will reasonably allow.  We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

(Admin. R. [DN 11-3] at 587.)   The Sixth Circuit has previously held that a disability benefits

plan employing similar eligibility requirements could require a claimant to provide objective

evidence of disability.  Huffaker v. Metro. Life Ins. Co., 271 F. App'x 493, 499 (6th Cir. 2008);

Rose v. Hartford Fin. Servs. Grp., Inc., 268 F. App'x 444, 453 (6th Cir. 2008); Cooper, 486 F.3d

at 166.   In Cooper, the Sixth Circuit held that "[r]equiring a claimant to provide objective

medical evidence of disability is not irrational or unreasonable."  Cooper, 486 F.3d at 166 (citing

Spangler v. Lockheed Martin Energy Sys., Inc., 313 F.3d 356, 361 (6th Cir. 2002)); see Oody v.

Kimberly-Clark Corp. Pension Plan, 215 Fed. App'x 447, 452 (6th Cir. 2007) (holding that

denial of disability benefits was not arbitrary and capricious where claimant "failed to submit

sufficient objective evidence to establish he was permanently and totally disabled, as defined by

the Plan"). The definition of "disability" at issue in <u>Cooper</u> required that the claimant prove inability to perform "all the material duties of his or her Regular Occupation," and did not explicitly require the claimant to provide objective evidence of disability. <u>Id.</u> at 159–60. The Sixth Circuit found the administrator's objective-evidence-of-disability requirement reasonable, explaining that "[o]bjective medical documentation of [the claimant's] functional capacity would have assisted [the administrator] in determining whether [the claimant] was capable of performing 'all the material duties of her Regular Occupation,' as required by the [long-term disability plan]'s definition of disability." <u>Id.</u> at 166.

Here, Plaintiff must similarly prove she is "cannot perform the material duties of any occupation" to satisfy the plan's definition of "totally disabled." As in <u>Cooper</u>, Reliance could reasonably interpret the plan's language to require objective evidence of disability. <u>Huffaker,</u> 271 F. App'x at 500; <u>see also</u> <u>Michele v. NCR Corp.</u>, No. 94-3518, 1995 WL 296331, at *3 (6th Cir. May 15, 1995) (holding that the administrator did not act arbitrarily or capriciously in denying long-term disability benefits for chronic fatigue syndrome where the plan requires proof of total disability from "a bodily injury or disease"; and the claimant failed to present sufficient objective medical evidence of total disability).

"A claimant could certainly find burdensome a requirement that she proffer objective evidence of fibromyalgia itself, the symptoms of which are largely subjective." <u>Huffaker,</u> 271 F. App'x at 500. However, "objective evidence of disability due to fibromyalgia can be furnished by a claimant without the same level of difficulty." <u>Id.</u>; <u>see</u> <u>Boardman v. Prudential Ins. Co.</u>, 337 F.3d 9, 16–17 n. 5 (1st Cir. 2003) ("While the diagnos[is] of . . . fibromyalgia may not lend [itself] to objective clinical findings, the physical limitations imposed by the symptoms of such illness[ ] do lend themselves to objective analysis."). For instance, one method of chronicling

objective proof of disability is through conducting a functional capacity evaluation, which has proven to be "a 'reliable and objective method of gauging' the extent one can complete work-related tasks." Id. (quoting Cooper, 486 F.3d at 176 (Sutton, J., concurring in part, dissenting in part)); see Hunt v. Metro. Life Ins. Co., 587 F. App'x 860, 862 (6th Cir. 2014) (finding it reasonable for the insurer "to require objective evidence of functional limitations resulting from [the plaintiff's] fibromyalgia—limitations that could, for example, have been chronicled by a functional capacity evaluation").   While it may "have been unreasonable for [Reliance] to request objective evidence of fibromyalgia and chronic fatigue syndrome—conditions that are diagnosed through an evaluation of an individual's subjective complaints of pain—[Reliance] did not require such evidence." Rose, 268 F. App'x at 454.  Instead, Reliance based its decision on the lack of objective evidence illustrating the effect that Plaintiff's conditions had on her functional capacity and its own objective evidence that Plaintiff was no longer totally disabled. See id.

Plaintiff claims that she has submitted objective proof of her total disability based on her fibromyalgia and chronic pain syndrome because she has produced "records of her physical examinations, chart notes, lab and other test results, and physician diagnoses, all of which qualify as objective medical evidence."  (Pl.'s Mem. Supp. Mot. Summ. J. [DN 23-1] at 38.)   As previously noted, "complaints of fatigue and joint pain" are "types of subjective complaints [that] are easy to make, but almost impossible to refute."  Huffaker, 271 F. App'x at 501 (quoting Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 382 (6th Cir. 1996) (holding that absent any "definite anatomic explanation of [a claimant]'s symptoms," an administrator's decision to deny disability benefits due to fibromyalgia was not arbitrary and capricious)). Plaintiff's evidence of her condition, therefore, is largely subjective.   Reliance conducted

functional capability tests through the independent medical exams and the residual employability analyses, which the Sixth Circuit has treated as objective evidence of the effect of Plaintiff's condition on her ability to work. Plaintiff claims that Reliance's crediting of these four analyses was arbitrary and capricious, as they evidenced how Reliance "cherry picked" evidence from Plaintiff's medical records in order to support a denial of benefits. However, all four objective tests, and even Dr. Johnson's initial report, indicated that Plaintiff was able to work at the sedentary level. The objective evidence here points to the fact that Plaintiff was able to perform other occupations, thus taking her out of the "totally disabled" category under her plan, as she was no longer incapable of performing the "material duties of any occupation."[3] When considering these results and without other objective evidence of her limited functional capabilities, given the Sixth Circuit's case law, Reliance did not act arbitrarily in denying Plaintiff's benefits due to a lack of objective evidence or because it required objective evidence of Plaintiff's disability.

In sum, Plaintiff has failed to satisfy her burden to show that she remained totally disabled under her long term disability plan, whereas Reliance has offered a reasoned explanation, based on substantial evidence, for its decision that Plaintiff is not disabled under the terms of its plan. Accordingly, the Court cannot conclude Reliance acted in an arbitrary and capricious manner when it terminated Plaintiff's long-term disability benefits.

---

[3] Plaintiff alternatively argues that she did not suffer from any mental disorder or illness under the policy and therefore her benefits should not have been discontinued on that basis. However, Reliance denied benefits because Plaintiff could no longer prove that she was "totally disabled" under the terms of the plan. Reliance paid Plaintiff long-term disability benefits for many years after the two-year maximum for mental illness. Therefore, regardless of whether Plaintiff had a mental illness or not, because Plaintiff was outside the two year time period for mental illness, "benefits could only be paid if Plaintiff proved that she was physically totally disabled." (Resp. [DN 24] at 18.) The issue here revolves purely around whether Plaintiff was totally *physically* disabled rather than mentally disabled and whether Reliance arbitrarily denied Plaintiff benefits based on substantial evidence that she was in fact not totally disabled. Thus, mental illness here appears irrelevant to the issues at hand.

### IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Judgment on the Administrative Record [DN 23] is **DENIED**.   A judgment in favor of Defendant shall be entered consistent with this Memorandum Opinion and Order.   Plaintiff's Motion for Leave to File a Reply Memorandum in Excess of Fifteen Pages [DN 25] is **GRANTED**.

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

September 25, 2016

cc: counsel of record